1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**MATTHEW SMELTZER,**

                Petitioner,

v.

**AUDREY KING,**

                Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 14-CV-1251-WQH (WVG)

**REPORT AND RECOMMENDATION ON PETITON FOR WRIT OF HABEAS CORPUS**

**[DOC. NO. 8]**

# I.

## INTRODUCTION

    Matthew Smeltzer ("Petitioner"), a civil committee, has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging his indeterminate civil commitment as a sexually violent predator ("SVP") under California Welfare and Institutions Code, § 6600 et. seq. (Doc. No. 8.) Petitioner asserts five grounds for relief, all of which were raised on direct appeal in state court. (Doc. No. 8 at

14-CV-1251

6-9.) Respondent's Answer concedes that the Petition is timely and that Petitioner properly exhausted each of his claims in state court. (Doc. No. 14.)

The Court has considered the Petition and Exhibits, Respondent's Answer, Petitioner's Traverse and all supporting documents submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **RECOMMENDS** that the Petition be **DENIED**.

## II.

## FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding that findings of fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal's opinion on Petitioner's direct appeal, affirming the judgment of the trial court. (Doc. No. 15-5.)

> [Petitioner's] civil commitment arose from his repeated acts of molestation of young children and his diagnosis of pedophilia. In 1985 when [Petitioner] was 29 years old, the 10-year-old daughter of his first wife accused him of digitally penetrating her vagina; these allegations were investigated but not pursued by the authorities. In 1991 when [Petitioner] was 34 years old, he sustained three convictions of lewd acts against a child under age 14, which formed the predicate offense for his SVP status.
>
> The 1991 offenses were committed on multiple occasions during a four-to-six-week period after [Petitioner] distributed a letter at his apartment complex inviting children, ages five to 10, to his apartment for "movie night." While his pregnant wife was at home in another room, [Petitioner] molested two seven-year-old

2

girls and a four-year-old girl while they were sitting on his lap covered with a blanket, including touching their genital areas over or under their underwear. With one of the seven-year-old victims, he also digitally penetrated her vagina and made her touch his penis while she was on his bed. Three other girls at the apartment complex also reported that [Petitioner] touched their genital area over their clothing; these charges were not part of his guilty plea but he later admitted to an interviewer that he molested four girls at his apartment. [Petitioner] told the probation officer that he would fantasize about these touchings while masturbating. [Petitioner] told the probation officer that he was afraid of being caught, but his desire to molest overcame his fear.

[Petitioner] was granted probation for the 1991 offenses, with a suspended 10-year sentence. While released on probation, he at times participated in sex offender treatment. In 1994, he violated probation by being with his children without supervision; this occurred when his wife felt it was safe to leave him alone with their infant twin sons because he had never molested boys and the boys were infants. After this violation, his probation was modified and reinstated. A few months later, he violated probation a second time by possessing obscene material about sexual acts with "quasi human/animal figures" that his therapist determined were "pedophilic in nature." Based on this second violation, his probation was revoked and he was sent to prison to serve the 10-year term.

[Petitioner] commenced his prison term in 1995, and he was released on parole in 1999. In 2000, he was caught walking out of his residence with a VCR and cartoon videos that would appeal to children, which was in violation of his parole. In this same year, he was found in possession of a list of names of children from Kenya and their ages; he stated he had been corresponding with

these children since 1997 through a pastor. He was sent to prison for violating parole and released in December 2000.

In 2002, he wrote letters to three 15-year-old girls using the name and address of a friend (also a convicted sex offender) who lived in the same hotel where he was residing. Also in 2002, he committed a child pornography offense by using a key to go into the friend's room and going online on the friend's computer. He admitted that over a five-to-eight month period he viewed 20 to 100 images of nude children in provocative poses and engaging in sexual acts. He said that "he knows it was not good to do, but he continued." After committing the child pornography offense, in 2003 he was determined to be an SVP and committed to a state hospital.

(Doc. No. 15-5 at 2-4.)

# III.

# PROCEDURAL HISTORY

## A. State Court Trial and Appeal

On June 25, 2010, the San Diego District Attorney's Office filed an Amended Petition for Involuntary Treatment of a Sexually Violent Predator seeking an indeterminate commitment pursuant to Welfare and Institutions Code § 6600 et seq. (Doc. No. 15-1 at 20-23.) The Amended Petition alleged that Petitioner was a sexually violent predator with a mental disorder and that he was likely to engage in sexually violent predatory criminal behavior in the future. (Doc. No. 15-1 at 22.) The Amended Petition requested the court commit Petitioner for an indeterminate term. (Doc. No. 15-1 at 22.)

After a first trial resulted in a hung jury, a second jury trial commenced on June 4, 2012 before the Honorable Howard H. Shore. (Doc. No. 15-2 at 119.) On June 20, 2012, the jury found that Petitioner was a sexually violent predator. (Doc. No. 15-1 at

14-CV-1251

136.) On June 21, 2012, the trial court ordered that Petitioner be committed to the Department of Mental Health for an indeterminate term. (Doc. No. 15-1 at 133-34.)

On June 22, 2012, Petitioner filed a direct appeal of the commitment in the California Court of Appeal, Fourth Appellate District, Division One. (Doc. No. 15-2 at 92.) Petitioner argued that the trial court violated his Fourteenth Amendment right to Due Process by limiting his presentation of expert testimony and declining to modify a jury instruction. (Doc. No. 15-3 at 37, 56.) Petitioner also argued that his indeterminate commitment violated his constitutional right to equal protection, denied him due process, subjected him to ex post facto violations and double jeopardy, and violated the ban on cruel and unusual punishment. (Doc. No. 15-3 at 37-130.) On August 7, 2013, the California Court of Appeal affirmed the trial court's rulings in an unpublished opinion. The court held that Petitioner's due process rights were not violated by the trial court's ruling to preclude experts from expounding on case law and that any error in declining to modify the jury instruction was harmless beyond a reasonable doubt. (Doc. No. 15-5 at 14, 17.) The California Court of Appeal rejected Petitioner's claims of denial of due process, ex post facto violation, cruel and unusual punishment, and double jeopardy citing People v. McKee, 223 P.3d 566 (Cal. 2010); People v. McKee, 144 Cal. Rptr. 3d 308 (Cal. Ct. App. 2012); People v. McDonald, 154 Cal. Rptr. 3d 823 (Cal. Ct. App. 2013); People v. Landau, 154 Cal. Rptr. 3d 1 (Cal. Ct. App. 2013); People v. McCloud, 153 Cal. Rptr. 3d 10 (Cal. Ct. App. 2013); and People v. McKnight, 151 Cal.Rptr.3d 132 (Cal. Ct. App. 2012), without a narrative explanation. (Doc. No. 15-5 at 19.) The court of appeal rejected Petitioner's equal protection claim procedurally and on the merits. (Doc. No. 15-5 at 19-20.)

On September 9, 2013, Petitioner filed a petition for review with the California Supreme Court. (Doc. No. 15-6.) The petition for review was denied on October 16, 2013, without comment. (Doc. No. 15-7.)

1

### B. <u>Habeas Petition in Federal Court</u>

2    On May 19, 2014, Petitioner filed a *pro se* petition for writ of habeas corpus

3   pursuant to 28 U.S.C. Section 2241 in this Court. (Doc. No. 1). On June 5, 2014, this

4   Court construed the petition to be under 28 U.S.C. Section 2254, and dismissed the

5   petition without prejudice for failure to pay the filing fee and failure to name a proper

6   respondent, allowing Petitioner until August 4, 2014 to correct the errors. (Doc. No. 2).

7   On March 24, 2015, Petitioner filed a motion for leave to file an amended petition (Doc.

8   No. 6) and a motion to proceed *in forma pauperis* (Doc. No. 4). On April 9, 2015 this

9   Court granted the motion for leave to file an amended petition no later than June 1, 2015,

10  and denied the motion to proceed *in forma pauperis*. (Doc. No. 7.) On May 4, 2015,

11  Petitioner filed a first amended petition for writ of habeas corpus pursuant to 28 U.S.C.

12  Section 2254. (Doc. No. 8.) Respondent filed an answer on July 29, 2015. (Doc. No. 15.)

13  On August 17, 2015, Petitioner filed a Traverse. (Doc. No. 16.)

14

### IV.

15

### <u>STANDARD OF REVIEW</u>

16    This Petition is governed by the Antiterrorism and Effective Death Penalty Act of

17  1996 ("AEDPA") because it was filed after April 24, 1996 and Petitioner is in custody

18  pursuant to the judgment of a state court. <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336

19  (1997). Under AEDPA, a court may not grant a habeas petition "with respect to any

20  claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. §

21  2254(d), unless the state court's judgment "resulted in a decision that was contrary to,

22  or involved an unreasonable application of, clearly established Federal law, as

23  determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on

24  an unreasonable determination of the facts in light of the evidence presented in the State

25  court proceeding," § 2254(d)(2).

26    A federal habeas court may grant relief under the "contrary to" clause "if 'the state

27  court applies a rule that contradicts the governing law set forth in Supreme Court cases.'"

28

6

14-CV-1251

Andrews v. Davis, 798 F.3d 759, 774 (9th Cir. 2015) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. See Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). However, "an unreasonable application of Supreme Court precedent is not one that is merely 'incorrect or erroneous' [citation omitted], rather, 'the pivotal question is whether the state court's application of the relevant Supreme Court precedent was *unreasonable*.'" Andrews, 798 F.3d at 774 (quoting Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) and Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)) (emphasis in original). Precedent is not "clearly established" law under section 2254(d)(1) "unless it 'squarely addresses the issue' in the case before the state court [citation omitted] or 'establishes a legal principal that clearly extends' to the case before the state court." Id. at 773 (quoting Wright v. Van Patten, 552 U.S. 120, 125-26, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008); Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008)).

In deciding a habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination. Rather, Section 2254(d) "sets forth a 'highly deferential standard, which demands that state-court decisions be given the benefit of the doubt.'" Id. at 774 (quoting Cullen v. Pinholster, 563 U.S. 170, 1398, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)). While not a complete bar on the relitigation of claims already rejected in state court proceedings, Section 2254(d) merely "'preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court precedent]' and 'goes no further.'" Id. (quoting Richter, 562 U.S. at 102).

Where there is no reasoned decision from the highest state court to which the claim was presented, the court "looks through" to the last reasoned state court decision

and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); Cannedy v. Adams, 706 F.3d 1148, 1156 (9th Cir. 2013), *as amended on denial of rehearing*, 733 F.3d 794 (9th Cir. 2013), *cert. denied*, − U.S. −, 134 S.Ct. 1001, 187 L.Ed.2d 863 (2014). If the dispositive state court does not furnish an explanation for its decision, a federal habeas court must "engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable." Murray v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. See Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. Id. Clearly established federal law, for purposes of Section 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Andrade, 538 U.S. at 72. Ninth Circuit cases may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court law and may be relevant to determining what Supreme Court law is clearly established. See Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).

## V.

## DISCUSSION

Petitioner's five grounds for relief are as follows: (1) his Fourteenth Amendment right to due process was violated when the trial court precluded his expert witness from discussing case law; (2) his Fourteenth Amendment right to due process was violated when the trial court declined to modify jury instructions; (3) his Fourteenth Amendment right to equal protection was violated when he was committed to an indeterminate term; (4) his indeterminate commitment violates his Fourteenth Amendment right to due

8

process, the Ex Post Facto Clause of Article I, § 10 of the U.S. Constitution, and the Eighth Amendment ban on cruel and unusual punishment; and (5) his indeterminate commitment violates the Double Jeopardy Clause of the Fifth Amendment. In support of each of these claims, Petitioner incorporates by reference his brief on direct appeal to the California Supreme Court. (Doc. No. 8 at 6-9.)

Respondent argues that the California Court of Appeal reasonably rejected each of the claims. First, Respondent argues that "[a] defendant's right to present evidence is not absolute for the defendant must comply with established rules of evidence and procedure," citing Taylor v. Illinois, 484 U.S. 400, 410-411, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). (Doc. No. 14-1 at 11.) Second, Respondent argues that "federal habeas relief may only be had when an erroneous jury instruction has infected the trial process to the point that the resulting conviction violates due process," citing Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). (Doc. No. 14-1 at 13.) Lastly, Respondent argues that the California Court of Appeal's succinct rejection of Petitioner's remaining constitutional claims was reasonable. (Doc. No. 14-1 at 16.)

**A. Due Process Claims**

Petitioner's first two claims under the Fourteenth Amendment due process clause attack the trial judge's decision to limit the testimony of Petitioner's expert and refusal to modify a jury instruction. The Fourteenth Amendment to the United States Constitution prohibits a state from "depriv[ing] any person of life, liberty or property without due process of law." U.S. Const. amend. XIV, § 1. "Civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). "Beyond the enumerated protections contained in the Bill of Rights, the Due Process Clause has limited operation," and violations of fundamental fairness have been "very narrowly" defined. Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). State court proceedings normally do not offend the Due Process

9

14-CV-1251

Clause unless they offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Patterson v. New York</u>, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

During collateral attacks on the judgment, "habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice.'" <u>Davis v. Ayala</u>, − U.S. −, −, 135 S.Ct. 2187, 2197 (2015) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). Thus, relief is only proper when a federal habeas court has "'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Id.</u> at 2198 (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)).

### i. Petitioner's Fourteenth Amendment Right to Due Process Was Not Violated By the Limitation of Testimony of the Defense Expert Witness

Petitioner contends that his Fourteenth Amendment right to due process was violated by the trial court ruling limiting the testimony of defense expert witness, Dr. Alan Abrams. Specifically, Petitioner argues that this ruling "precluded [Petitioner] from confronting the prosecution's experts about their misunderstanding of the standard, [and] presenting his expert's testimony on a key issue," and thus violated his right to due process. (Doc. No. 8 at 23.)

In the California Court of Appeal, Petitioner challenged the trial court's limitation on expert testimony. The court of appeal affirmed the trial court's ruling. Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition. The last reasoned state court decision, which addresses the merits of the claim, is the California Court of Appeal's opinion affirming the trial court's ruling on expert witnesses. It is to that decision this Court must direct its analysis. <u>Ylst</u>, 501 U.S. at 805-06.

The court of appeal found the following facts regarding the expert testimony:

> At several points while pursuing the control impairment issue, defense counsel asked the People's experts about the case law, including the *Burris* case. In response, the court admonished counsel not to get into a discussion of the witness's interpretation of the case law; however, the witness could state what standards he used to form his opinion, and the jury could determine whether the standards used by the witness comported with the court's instructions on the law. Based on this ruling, the court told defense counsel not "to go any further into discussion of specific cases" while questioning Dr. Owen about the seriousness requirement, and the court sustained an objection to defense counsel's questioning of Dr. Simon about the factual details of the *Burris* case.
>
> During the defense case, the defense expert witness (psychiatrist Alan Abrams) testified that SVP case law requires that the person have serious difficulty controlling his or her sexual violence. When defense counsel sought to elicit testimony from Dr. Abrams about the *Burris* case, the trial court reiterated that the expert witness could state the definition he used and the jury could compare it with the definition given by the court, but the questioning could not involve "a legal discussion."

(Doc. No. 15-5 at 13.)

The California Court of Appeal affirmed the trial court's ruling limiting the testimony of Dr. Alan Abrams. (Doc. No. 15-5 at 2.) The court reasoned:

> Contrary to [Petitioner's] contention, he was not precluded from challenging the People's experts' reliance on recidivism as a factor showing control impairment. Defense counsel elicited testimony from the defense expert that the correct standard was whether the person had serious difficulty controlling sexual misbehavior, and recidivism was simply one relevant factor to consider. [Petitioner] has not explained how testimony from the

11

1
2

> defense expert on the specifics of the *Burris* decision would have meaningfully augmented the defense expert's testimony on this point.

3
4
5
6
7

> The record shows [Petitioner] had a full opportunity to present testimony from his expert witness on the definition of volitional impairment, and his due process rights were not impeded by the trial court's ruling precluding both the People's and the defense experts from expounding on the case law underlying the volitional impairment definition.

8

(Doc. No. 15-5 at 14.)

9

This Court agrees with the California Court of Appeal. Trial judges may "exclude

10

evidence if its probative value is outweighed by certain other factors such as unfair

11

prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. South

12

Carolina, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); see also United

13

States. v. Espinoza-Baza, 647 F.3d 1182, 1188 (9th Cir. 2011). Moreover, it is the court,

14

and not a witness, not even an expert witness, that establishes the law of the case to be

15

used by the trier of fact through the use of jury instructions, and witnesses are typically

16

prohibited from testifying about the law. Summers v. AL Gilbert Co., 69 Cal. App. 4th

17

1155, 1178-84 (1999); see also Nationwide Transport Finance v. Cass Information

18

Systems, Inc., 523 F.3d 1051, 1058 (9th Cir. 2008). Further, errors in the admission or

19

exclusion of evidence are generally not a basis for federal habeas corpus relief. Charlton

20

v. Kelly, 229 U.S. 447, 457, 33 S.Ct. 945, 57 L. Ed. 1274 (1913). A habeas petitioner

21

"is entitled to relief if the evidentiary decision created an absence of fundamental

22

fairness that 'fatally infected the trial.'" Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th

23

Cir. 1996) (quoting Keaohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

24

Petitioner argues that the government's expert witnesses, Dr. Robert Owen and

25

Dr. Eric Simon, were able to testify about People v. Burris, 126 Cal.Rptr.2d 113 (Cal.

26

Ct. App. 2002), in regards to their determination of volitional impairment but that

27

Petitioner's expert, Dr. Abrams, was precluded from explaining how Burris applied in

28

Petitioner's case. (Doc. No. 8 at 27-28.) Petitioner is correct in stating that the government's experts did testify to some extent about the Burris decision. However, much of this discussion was elicited from Petitioner's counsel on cross-examination and not from the government.

When cross-examining Dr. Owen, the government's expert witness, Petitioner's counsel inquired as to Dr. Owen's knowledge of volitional impairment requirements. When asked about volitional impairment, the following discussion occurred:

> A: I think it's wider than that. I think really it has to do with impulsivity. You mentioned me knowing the law. I think the Burris decision in talking about failure to be deterred by prior consequences is really a great definition here of volitional impairment.
> Q: And what is that definition?
> A: The definition is that if a man is basically placed on community supervision and fails it, he has not been detoured by a prior consequence. That's volitional impairment according to that decision.
> Q: Another important – I'm going to come back to that in a minute.

(Doc. No. 15-12 at 77-78.) Petitioner's counsel then clarified another aspect of the SVP requirements before returning to the volition impairment question. Again, Petitioner's counsel continued to confront the prosecutor's evaluators about their impression of the volitional impairment standard:

> Q: So one of the criteria we look for, as you indicated just now, that the court's indicated you can look for to see if someone has this volitional impairment is to see if they, after they commit the offense and, you know, get some kind of sanction, they continue to commit that offense again, right?
> A: I think it's wider than that. I think we're looking at their whole adjustment in the community, not just whether they've gone out and committed a similar offense.

13

> Q: Isn't it true that the case you referred to indicates that
> if there is a sanction for the offending behavior and they
> continue to offend, that can be considered a basis for
> viewing they had some kind of volitional impairment?
> A: Yes.

(Doc. No 15-12 at 78-79.) Petitioner's counsel continued the examination without interruption in regards to the <u>Burris</u> case, and again sought further clarification regarding the volitional standard set out in <u>Burris</u>:

> Q: The law for S.V.P. inclusion requires a higher standard
> than that, correct?
> A: The law requires emotional or volitional impairment.
> Q: Serious emotional or volitional impairment?
> A: True.

(Doc. No. 15-12 at 153.) The government objected that this testimony was a misstatement of law because the word 'serious' is not in the statute. (Doc. No. 15-12 at 154.) The court overruled the objection, allowing the witness to testify as to what standard they used to form an opinion but not a discussion of the law because that would come from the court. (Doc. No. 15-12 at 153.) Petitioner's counsel continued the cross-examination of Dr. Owen and further clarified the volitional impairment standard used in his examination of Petitioner.

> Q: Doctor, what standard did you use?
> A: I'm using the standard of the initial law, the 6600
> statute, and I'm relying upon the <u>Crane</u> and <u>Burris</u>
> discussion of volitional impairment.
> Q: What do those cases tell you that relied upon as far as
> determining your standards? [sic]
> A: Well, <u>Crane</u> basically looks at the fact that volitional
> impairment has to be present and spells that out. <u>Burris</u>
> talks about what it entails, what is volitional impairment,
> and, again, the <u>Burris</u> decision says that if a man has not
> been deterred by a prior consequence such as going to
> prison, this is an example of volitional impairment.

14-CV-1251

(Doc. No. 15-12 at 156-57.) The cross-examination concluded without further objections from the government and the court regarding the discussion of case law and the prosecutor did not ask about case law on redirect. (Doc. No. 8 at 168.) It is clear from the record that Petitioner was not precluded from confronting government expert witness Dr. Owen about his understanding of the standard for volitional impairment.

Similar to the examination of Dr. Owen, the examination of Dr. Simon and his understanding of the Burris case was elicited primarily from Petitioner's counsel on cross-examination. However, on direct examination by the government, Dr. Simon was asked if Petitioner's crimes were evidence of Petitioner's volitional impairment. Dr. Simon testified:

> My opinion is based on two things: It's based on – with all these repeated data points, this suggests to me that there is a driven quality to his actions. He is driven to do this by something kicking around inside of him, I.E., pedophilia. The other reason for my opinion is that I rely on the People vs. Burris case law, which instructed as I understand it, that volitional impairment by that court was defined as someone who evidences a pattern of detection followed by punishment followed by new sex offenses, that that is evidence of a – that the person's not likely to be deterred by the threat of future criminal punishment and that that would indicate volitional impairment.

(Doc. No. 15-13 at 52.) The government's examination continued without further discussion of Burris. On cross-examination, Petitioner's counsel confronted Dr. Simon on his understanding of the Burris case. Dr. Simon stated:

> My understanding is – I don't remember the whole case, but as it applies to this issue, my understanding is that if the individual has shown by way of a pattern of detection followed by reoffending, that they're unlikely to – that the threat of future criminal punishment is unlikely to deter them, that that constitutes volitional impairment.

15

14-CV-1251

(Doc. No. 15-13 at 151.) Petitioner's counsel began to question Dr. Simon about his knowledge of evidentiary issues from <u>Burris</u> before the government objected. (Doc. No. 15-13 at 151.) The court sustained the objection stating the witness could testify as to what they used to form their opinion but that analysis of appellate court decisions was improper. (Doc. No. 15-13 at 151.) On numerous other occasions, Petitioner's counsel questions the government's witness, Dr. Simon, about the volitional impairment issue. (Doc. No. 15-13 at 154, 159-61.) Redirect and re-cross examinations continued without further discussion of <u>Burris</u> or volitional impairment. It is clear from the record that contrary to Petitioner's claim, Petitioner's counsel was not precluded from confronting either of the government's experts about their understanding of the volitional impairment standards.

Petitioner also claims the court precluded him from presenting his expert's testimony about the volitional impairment standard. Petitioner's attorney began to ask about volitional impairment by asking how Dr. Abrams, Petitioner's expert witness, comes to the definitions he uses when analyzing an individual. After Dr. Abrams stated that he relied in part on case law, Petitioner's counsel asked:

> Q: And what are the basic landmark cases that you utilize in coming into your determinations?
> A: Well, I think in the federal constitutional arena, <u>Kansas v. Hendricks</u> and <u>Kansas v. Crane</u> set the minimal constitutional criteria. In California, of course, <u>Euberg</u> and <u>Ghilotti</u> are some of the cases that lay out the framework regarding the issue of volitional impairment. We also have the case of <u>Burris</u> and other cases.

(Doc. No. 15-16 at 79.) Petitioner's counsel then asked if the cases Dr. Abrams just named stated the requirement for volitional impairment. The court intervened and reminded counsel that the witness can state "whatever definition he uses" but the instruction on the law will come from the court. (Doc. No. 15-16 at 80.) After a sidebar discussion, Petitioner's counsel continued his examination of Dr. Abrams including a

14-CV-1251

lengthy discussion of Dr. Abrams' definition of volitional impairment. (Doc. No. 15-16 at 81.) Notably, Petitioner's counsel never directly asked what standard or definition of volitional impairment was used as Petitioner's counsel had done with the government's expert witnesses. Petitioner's counsel was not precluded from presenting expert witness testimony on the issue of volitional impairment. Thus, Petitioner has not established that the "evidentiary decision" to preclude Dr. Abrams from testifying about case law "created an absence of fundamental fairness that fatally infected the trial." Ortiz-Sandoval, 81 F.3d at 897 (9th Cir. 1996). Accordingly, Petitioner is not entitled to relief as to this claim.

### ii.  Petitioner's Fourteenth Amendment Due Process Right Was Not Violated When the Trial Court Declined to Modify the Jury Instruction

Petitioner contends that his Fourteenth Amendment right to due process was violated when the trial court denied defense counsel's request to modify jury instructions. Petitioner's counsel requested the jury be instructed that any mental disorder must *seriously affect* the person's ability to control behavior, instead of instructing the jury that the person's mental disorder must *affect* the person's ability to control behavior. (Doc. No. 8 at 32.) (emphasis added).

In the California Court of Appeal, Petitioner challenged the trial court's rejection of defense counsel's request to modify the jury instruction. The court of appeal affirmed the trial court's ruling.  Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition. The last reasoned state court decision, which addresses the merits of the claim, is the California Court of Appeal's opinion affirming the trial court's ruling declining to modify the jury instruction.  It is to that decision this Court must direct its analysis. Ylst, 501 U.S. at 805-06.

The court of appeal affirmed the trial court's ruling declining to modify the jury instruction regarding the volitional impairment standard. (Doc. No. 15-5 at 17.) The court reasoned:

In appropriate circumstances a defendant is entitled upon request to an instruction that clarifies the law. Assuming arguendo the court erred by declining to add the word "serious" to the instruction, any error was harmless beyond a reasonable doubt. Viewing the record as a whole, we have no doubt the jury understood the control impairment must be serious. The SVP instructions told the jury that (1) the disorder must make it *likely* the person will engage in sexually violent predatory behavior; (2) the disorder includes conditions affecting the ability to control that create a predisposition to commit sexual acts to *such an extent* that the person is a *menace* to safety; and (3) there is a likelihood of sexually violent predatory behavior if there is a *substantial, serious, and well-founded risk* of such conduct. An instruction requiring that the person must constitute a menace to society and pose a substantial and serious risk of misconduct undoubtedly conveyed to the jury that the control impairment must be serious.

Further, the serious control impairment requirement was conceded during the testimony of People's expert Dr. Simon, who acknowledged that persons who meet the SVP criteria have a "serious deficiency" in their ability to control themselves. In closing arguments, although counsel for both parties sought to define the term "serious" in the manner most favorable to their positions, there was no claim that seriousness was not a requirement. The prosecutor argued that [Petitioner's] control was impaired to such a degree that he acted even though he knew he might suffer criminal consequences: "Volitional capacity, he was able to override his fears that told him 'Don't do this behavior… You're going to get caught.' He did it anyways. So that shows the volitional capacity that's impaired, that it's affected." Defense counsel emphasized that an SVP finding requires a "serious impairment" of ability to control to "such an intensity of urge and effect on the person that they lose control of their volition,"; an "inability to control" such that the person poses a "serious, substantial and well-founded risk…"; "we're looking for

14-CV-1251

those people that can't control themselves…" In rebuttal the prosecutor argued that [Petitioner's] pedophilia affected his ability to control, he could not control his behavior, and he posed a serious, nontrivial risk of reoffending. "Does he have a disorder that affects his ability to control his behavior? Yes. Is he likely to reoffend again? Yes… And what's the other bit of evidence that we have that shows that *he cannot control* his behavior? We have the investigation in '85, arrest in '91, crime-arrest, crime-arrest cycle… *Is the risk presented serious*? Yes? What's the antonym? Trivial or meaningless. Are we talking meaningless risk here? No. Even his own experts say he presents a risk. All the instruments…place him in either the moderate-high or the high-risk component."

The record as a whole shows the jurors were presented with testimony, instructions, and closing argument that repeatedly informed them that the control impairment must be serious. There is no reasonable possibility the jury thought [Petitioner] could qualify as an SVP if he did not have serious difficulty controlling his pedophilia. Accordingly, any error in failing to clarify the seriousness requirement in the jury instructions was harmless.

(Doc. No. 15-5 at 17-19.) (emphasis in original) (internal citations omitted).

This Court agrees with the California Court of Appeal. "Instructional error will not support a petition for federal writ of habeas relief unless it is shown 'not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' [citation omitted], but 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)); see also Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1997). Moreover, the allegedly erroneous jury instruction cannot be judged in isolation. Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Rather, it must be considered in the context of the entire trial record and the

1  instructions as a whole. Id.; see also Gilmore v. Taylor, 508 U.S. 333, 343-44, 113 S.Ct.

2  2112, 124 L.Ed.2d 306 (1993) (finding that the right to present a complete defense does

3  not entitle a defendant to a particular set of jury instructions). Where the alleged error is

4  the failure to give an instruction, the burden on the petitioner is "especially heavy."

5  Henderson, 431 U.S. at 145.

6       Petitioner argues that the instruction provided to the jury was inadequate because

7  the proper question for jurors was whether the prosecution had proved beyond a

8  reasonable doubt that Petitioner's disorder seriously affected his ability to control

9  behavior. (Doc. No. 8 at 35.) However, when considered in the context of the entire trial

10  record, it is clear that the seriousness required was conveyed to the jurors. The level of

11  seriousness required was conveyed to the jury during the State's case in chief, during

12  Petitioner's case in chief, and during closing arguments. In addition, the jury instructions

13  as a whole properly conveyed to the jury that Petitioner's disorder must seriously affect

14  his ability to control behavior. No reasonable juror having heard the instructions in their

15  entirety as well as all of evidence would have concluded that a disorder which does not

16  seriously affect behavior would satisfy the SVP requirements. The prosecutor did

17  nothing to even suggest to the jury that Petitioner's disorder need not seriously affect his

18  behavior to qualify under the SVP requirements. Petitioner has not established that any

19  jury instruction error occurred nor that any error "so infected the entire trial that the

20  resulting conviction violates due process." Murtishaw, 255 F.3d at 971 (internal citations

21  omitted). Accordingly, Petitioner is not entitled to relief as to this claim.

22  **B. Petitioner's Fourteenth Amendment Rights To Equal Protection And Due Process Were Not Violated When He Was Committed For An Indeterminate Term**

23

24

25       Petitioner contends that his Fourteenth Amendment rights to equal protection and

26  due process were violated when the trial court committed him to an indeterminate term.

27  Petitioner argues that he has a more difficult burden to regain freedom than similarly

28

14-CV-1251

situated persons committed under other civil commitment schemes, such as those committed as a mentally disordered offender ("MDO") or an individual found not guilty by reason of insanity ("NGI"), without justification. (Doc. No. 8 at 38.) Further, Petitioner argues he was entitled to an evidentiary hearing to demonstrate that he should not receive disparate treatment violating his due process right. (Doc. No. 8 at 39.) Respondent argues that the court of appeal was reasonable in rejecting Petitioner's claims. (Doc. No. 14-1 at 11-12.)

In the California Court of Appeal, Petitioner challenged the trial court's indeterminate commitment. The court of appeal rejected Petitioner's equal protection claim both procedurally and on the merits. Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition. The last reasoned state court decision, which addresses the merits of the claim, is the California Court of Appeal's opinion rejecting Petitioner's equal protection claim. It is to that decision this Court must direct its analysis. Ylst, 501 U.S. at 805-06.

The Court of Appeal rejected Petitioner's equal protection challenge to his indeterminate commitment. (Doc. No. 15-5 at 19-20.) The court reasoned:

> In *McKee I*, the California Supreme Court stated that on remand the People would have an opportunity to prove that SVP's "as a class" pose a greater risk than similarly-situated offenders so as to justify indefinite, commitment "at least as applied to McKee." (*McKee I*, *supra*, 47 Ca1.4th at pp. 1208, 1210.) At the remand hearing, after an extensive evidentiary presentation, the trial court found the People had made the requisite showing, and on appeal our court affirmed the trial court's ruling. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1330-1331, 1348.) In our decision on appeal, we concluded that the information presented by the People supported that SVP's as a class pose distinct dangers that permit them to be treated differently from other types of offenders, and our holding was not premised on McKee's particular characteristics.

> (*Id.* at pp. 1340-1348.) Given the scope of our holding, we reject [Petitioner's] contention that he is entitled to an individualized determination of his equal protection challenge. (Accord, *People v. McKnight*, *supra*, 212 Cal.App.4th at pp. 863-864 [*McKee II*'s equal protection holding applies to "class of SVP's as a whole," not to Mr. McKee alone]; *People v. McDonald*, *supra*, 214 Cal.App.4th at pp. 1377-1378.)

(Doc. No. 15-5 at 20.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). However, the Equal Protection Clause does not require identical treatment, rather, it "guarantees that the government will not classify individuals on the basis of impermissible criteria." Coal. For Econ. Equity v. Wilson, 122 F.3d 692, 702 (9th Cir. 1997). Further, a "legislative classification will deny equal protection only if it is not 'rationally related to a legitimate state interest.'" Id. (quoting City of Cleburne, 473 U.S. at 440). Thus, Petitioner must show either (1) that the court was objectively unreasonable in holding that SVPs are not similarly situated to MDOs and NGIs or, (2) show "that it was objectively unreasonable to conclude, [citation omitted], that there was a rational relationship between the differential treatment and a legitimate government purpose, [citation omitted]. Seebooth v. Allenby, 789 F.3d 1099, 1105-06 (9th Cir. 2015) (quoting Williams, 529 U.S. at 409) (citing Coal. For Econ. Equity, 122 F.3d at 702).

It has been held repeatedly, in both state and federal courts, that SVPs are not similarly situated to other civilly committed individuals. See Taylor v. San Diego County, — F.3d — (9th Cir. 2015), WL5234755 at *6 (holding that individuals who are committed under the California Lanterman-Petris Short Act are not similarly situated to those committed under the California Sexually Violent Predators Act); Litmon v. Harris,

14-CV-1251

768 F.3d 1237, 1243 (9th Cir. 2014) (holding that "neither mentally disordered offenders nor mentally disordered sex offenders are similarly situated to sexually violent predators."); Hubbart v. Knapp, 379 F.3d 773, 782 (9th Cir. 2004) (holding that California state courts reasonably found that sexually violent predators were not denied equal protection when compared to other civilly committed offenders.) People v. McKee, 223 P.3d 566, 581 (Cal. 2010) (noting that "those who are reasonably determined to represent a greater danger may be treated differently.") The facts in this Petition are nearly identical to the cases cited. The court of appeal reasonably could have found the SVPs are not similarly situated to MDOs or NGIs. Petitioner has made no attempt to distinguish this precedent, nor does Petitioner attempt to show that the court of appeal was unreasonable in rejecting his claims. Accordingly, the holding of the court of appeal was not contrary to Supreme Court precedent or objectively unreasonable.

Petitioner was unable to show that it was unreasonable to find that SVPs are not similarly situated to MDOs or NGIs, and Petitioner must now show that the court of appeal was objectively unreasonable in concluding that there was a rational relationship between differential treatment and a legitimate government purpose. In Seeboth v. Allenby, the Ninth Circuit Court of Appeals recently examined this relationship regarding California's SVP statutes. The court stated:

> The state's interest in preventing violent crime is more than legitimate; it is compelling. United States v. Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The narrower question is whether it was objectively unreasonable for the state courts to hold that the state legislature had a rational reason to distinguish between individuals who have been found to be mentally ill and dangerous (MDOs and NGIs) and individuals who have been found to be mentally ill and sexually dangerous (SVPs). With respect to the procedural steps in the civil recommitment process that are at issue here, the state court reasonably concluded that California may make such a distinction. See Thielman v. Leean, 282 F.3d 478, 485 (7th

Cir.2002) ("[I]t is not unreasonable for the State to believe that a person with a mental disorder of a sexual nature is qualitatively more dangerous than another mental patient who nonetheless threatens danger to himself or others."); see also Kansas v. Hendricks, 521 U.S. 346, 364–65, 117

S.Ct. 2072, 138 L.Ed.2d 501 (1997) (upholding Kansas' civil commitment law for sexually violent predators against a due process challenge, in part because the law applied to a "narrow class of particularly dangerous individuals").

Seeboth, 789 F.3d at 1106. The facts of that case also are nearly identical to the facts in the instant Petition. The state court of appeal reasonably could have found there was a rational relationship between the differential treatment and a legitimate government interest. Petitioner has made no attempt to distinguish this precedent, nor does Petitioner attempt to show that the court of appeal was unreasonable in rejecting his claims. Therefore, the court of appeal was not contrary to Supreme Court precedent or objectively unreasonable in rejecting Petitioner's claim. Accordingly, Petitioner is not entitled to relief as to this claim.

## C. **Petitioner's Remaining Constitutional Claims Regarding His Indeterminate Commitment**

In his remaining three claims, Petitioner contends that the indeterminate commitment violates several constitutionally protected rights as follows: (1) denial of his Fourteenth Amendment right to due process; (2) violation of the Ex Post Facto Clause, (3) violation of Eighth Amendment ban on cruel and unusual punishment; and (4) violation of the Double Jeopardy Clause of the Fifth Amendment. (Doc. No. 8 at 8-9.) Petitioner challenged the trial court's indeterminate commitment on the above listed grounds in the California Court of Appeal. The court of appeal rejected Petitioner's challenges, stating the following:

[Petitioner] raises several constitutional challenges to his indeterminate commitment that have been repeatedly rejected by the courts, including denial of equal protection, denial of due process, ex post facto violation, cruel and unusual punishment, and double jeopardy. (*People v. McKee* (2010) 47 Cal.4th 1172, 1193, 1195 (*McKee I*) [rejecting due process and ex post facto challenges]; *People v. McKee* (2012) 207 Cal.App.4th 1325, 1347-1348 (*McKee II*) [rejecting equal protection challenge]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1383 [rejecting cruel and unusual punishment and double jeopardy challenges]; accord *People v. Landau* (2013) 214 Cal.App.4th 1, 8, 44-45; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.) We agree with this case authority, and it is not necessary for us to repeat the extensive analyses set forth in these decisions that respond to [Petitioner's] challenges. Based on this precedent, we reject [Petitioner's] various constitutional challenges.

(Doc. No. 15-5 at 19). Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition. This Court must direct its analysis to the last reasoned state court decision. Ylst, 501 U.S. at 805-06.

### i. Petitioner's Civil Commitment of an Indeterminate Term Does Not Violate Petitioner's Fourteenth Amendment Right to Due Process

Petitioner contends that his indeterminate commitment violates his Fourteenth Amendment right to due process, the Ex Post Facto Clause, and the ban against cruel and unusual punishment. Specifically, Petitioner claims that California Health and Wellness Section 6600 et seq violates due process because (1) the detainee is not entitled to the assistance of an expert and (2) has the burden of proof in any hearing ordered by the trial court. (Doc. No. 8 at 48, 50-51, 53.)

In the California Court of Appeal, Petitioner challenged the trial court's indeterminate commitment. The court of appeal rejected Petitioner's due process and

14-CV-1251

cruel and unusual punishment claims without a narrative explanation, citing <u>People v. McKee</u>, 223 P.3d 566, 577-78 (Cal. 2010) and <u>People v. McDonald</u>, 154 Cal. Rptr. 3d 823, 835 (Cal. Ct. App. 2013).  Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition.

Petitioner first argues that he is denied due process because indigent civil committees are not appointed an expert when attempting to obtain release from civil commitment. However, contrary to Petitioner's claim, indigent civil committees are appointed an expert when attempting to obtain release from civil commitment. The California Supreme Court has ruled that experts must indeed be provided to indigent civil committees. The court stated:

> Given that the denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe <u>section 6608, subdivision (a)</u>, read in conjunction with <u>section 6605, subdivision (a)</u>, to mandate appointment of an expert for an indigent SVP who petitions the court for release.

<u>People v. McKee</u>, 223 P.3d 566, 576 (Cal. 2010). Thus, Petitioner's first argument fails.

Petitioner next argues that his indeterminate commitment violates his right to due process because he has the burden of showing he is no longer a SVP. The Supreme Court has "consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards." <u>Kansas v. Hendricks</u>, 521 U.S. 346, 357, (1997) 117 S.Ct. 2072, 138 L.Ed.2d 501 (citing <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80, (1992) 112 S.Ct., at 1785–1786; <u>Addington v. Texas</u>, 441 U.S. 418, 426–427, 99 S.Ct. 1804, 1809–1810, 60 L.Ed.2d 323 (1979). The Supreme Court has never held in the context of individuals involuntarily civilly committed that the Constitution bars the state from shifting the burden of proof to the civil committee. Furthermore, the Supreme Court has rejected due process challenges to

a statute that shifted to a defendant "the burden of proving by a preponderance of the evidence that he [was] no longer mentally ill or dangerous. [citation omitted]" <u>Jones v. United States</u>, 463 U.S. 354, 357, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).  Although <u>Jones</u> dealt with a criminal defendant found not guilty by reason of insanity, the statutory requirements are similar. The NGI scheme in <u>Jones</u> "establishe[d] two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." <u>Id.</u> at 363. Similarly, a SVP in California is one who has "been convicted of a sexually violent offense" and "has a diagnosed mental disorder that makes the person a danger to the health and safety of others." Calif. Welf. & Inst. Code §6600(a)(1). Thus, the court of appeal rejecting Petitioner's due process claim was not contrary to Supreme Court precedent.

The state court of appeal reasonably could have found Petitioner's case to be analogous to the Supreme Court precedent stated in <u>Jones</u>. Petitioner argues that the Supreme Court in <u>Foucha</u> forbade such burden shifting schemes because of the risk of continued commitment once a civil committee is free from mental illness. (Doc. No. 8 at 49.) Petitioner is correct that a SVP may be held "as long as he is both mentally ill and dangerous, but no longer." <u>Foucha</u>, 504 U.S. at 77. However, <u>Foucha</u> states that individuals may not be committed after they are no longer suffering from a mental illness and does not address burden shifting schemes. In California, the Department of Mental Health may file for release if it determines a SVP's "diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others." Calif. Welf. & Inst. Code § 6605(a). Further, "[a] person who has been committed as a sexually violent predator shall be permitted to petition the court for conditional release with or without the recommendation or concurrence of the Director of State Hospitals." <u>Id.</u> § 6608(a). Both of these mechanisms of release greatly mitigate the concerns raised in <u>Foucha</u>. Therefore, the court of appeal was not contrary to Supreme Court precedent or objectively unreasonable in rejecting Petitioner's claim.

27

14-CV-1251

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### ii.    Petitioner's Indeterminate Civil Commitment Does Not Violate The Ex Post Facto and Double Jeopardy Clauses

Petitioner contends that the modification to Section 6600 et seq by Proposition 83 violates the Ex Post Facto clause and his indeterminate commitment violates the Double Jeopardy Clause of the Fifth Amendment. In regards to the double jeopardy claim, Petitioner argues that the "requirement for an indeterminate commitment with the offender having the burden of proving his fitness for release converts the Act, in practical purpose and effect, into the old Indeterminate Sentencing Law." (Doc. No. 8 at 55.)

In the California Court of Appeal, Petitioner challenged the trial court's indeterminate commitment. The court of appeal rejected Petitioner's double jeopardy and ex post facto claims without a narrative explanation, citing People v. McDonald, 154 Cal. Rptr. 3d 823 (Cal. Ct. App. 2013) and People v. McKee, 223 P.3d 566, 577-78 (Cal. 2010). Petitioner then filed a Petition for Review in the California Supreme Court, which summarily denied his petition.

The Ex Post Facto Clause prevents legislatures from "retroactively alter[ing] the definition of crimes or increase[ing] the punishment for criminal acts." Collins v. Youngblood, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). The Ex Post Facto Clause pertains "exclusively to penal statutes." Hendricks, 521 U.S. at 370. The Double Jeopardy Clause states that no person shall be "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. However, "[t]he Clause protects only against the imposition of multiple *criminal* punishments for the same offense." Hudson v. U.S., 522 U.S. 93, 99, 118 S.Ct. 488 (1997) (citing Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L. Ed. 917 (1938) (emphasis in original). Thus, a necessary prerequisite for both ex post facto and double jeopardy challenges is the punitive nature of the statute.

When determining if a statute is punitive, the test is the same for an ex post fact claim and a double jeopardy claim. Russel v. Gregoire, 124 F.3d 1079, 1087 (9th Cir.

28

14-CV-1251

1997.) (noting the Court in <u>Hendricks</u> used the same test for both the double jeopardy and ex post facto claims. <u>Hendricks</u>, 521 U.S. at 361-71.). This Court must first consider the legislative intent of the challenged statute then, if the purpose is not found to be punitive, the Court must analyze the effects of the statute by applying the seven-factor <u>Kennedy</u> test to determine whether the effects of the statute are punitive. <u>See</u> <u>Smith v. Doe I</u>, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (articulating the analytical framework for determining whether a statute is punitive); <u>Hatton v. Bonner</u>, 356 F.3d 955 (9th Cir. 2003) (applying the two-part <u>Smith</u> test to determine whether a statute requiring sex-offenders to register with the state is punitive for Ex Post Facto purposes); <u>Young v. Weston</u>, 344 F.3d 973 (9th Cir. 2003)(applying the two-part <u>Smith</u> test to the Washington sexual violent predator statute for ex post facto and double jeopardy purposes). The <u>Kennedy</u> factors are: (1) whether the sanction involves an affirmative disability or restraint; (2) whether the sanction has historically been regarded as a punishment; (3) whether the sanction comes into play only on a finding of scienter; (4) whether the sanction's operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which the sanction applies is already a crime; (6) whether an alternative purpose to which the sanction rationally may be connected is assignable to it; and (7) whether the sanction appears excessive in relation to the alternative purpose assigned. <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168-69 (1963).

   In evaluating the ex post facto and double jeopardy claims, the Court must first determine if the legislature intended the statute to be civil or punitive. <u>Smith</u>, 538 U.S. at 92. Deference is given to the legislature's stated intent and only the clearest proof will be sufficient to override legislative intent and transform a civil remedy into a criminal penalty. <u>Id</u>. Applying this analysis, the Court finds that the legislature did not intend Section 6600 et seq to be punitive. The California legislature plainly stated the statute was "not for any punitive purpose[]" but that "individuals be committed and treated for

14-CV-1251

their disorders" so long as their disorder exists. 1995 Cal. Legis. Serv. Ch. 763 (A.B. 888) (WEST). Additionally, the Sexually Violent Predator Act was placed in the Welfare and Institutions Code, with other schemes concerned with the care and treatment of various mentally ill and disabled groups. See, e.g., §§ 5000 (LPS Act), 6500 (Mentally Retarded Persons Law). Moreover, the California Supreme Court has held that Section 6600 et seq is a "civil scheme designed to protect the public from harm." Hubbart v. Superior Court, 969 P.2d 584, 606 (Cal. 1999) (quoting Hendricks, 521 U.S. at 361.).

In 2006, California voters passed Proposition 83 which modified Section 6604 of the Sexually Violent Predator Act to civilly commit those found beyond a reasonable doubt to an indefinite term, rather than the two year term as previously required by the Act. Nothing suggests that the legislative intent of civil commitment and treatment is different as a result of Proposition 83 and Petitioner offers no evidence to suggest the legislature's intent changed. Further, the California Supreme Court has held that "the Proposition 83 amendments do not make the [Sexually Violent Predator Act] punitive." People v. McKee, 223 P.3d 566, 578 (Cal. 2010).

Having determined the California legislature did not intend Section 6600 et seq to be punitive, the Court next analyzes whether the effects of the statute are punitive by applying the seven-factor Kennedy test. The Court considers each factor in turn.

As to the first, whether Section 6600 et seq imposes an affirmative disability or restraint, it is clear that a civil commitment imposes an affirmative restraint on liberty. However, "[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded." Hendricks, 521 U.S. at 363. This factor weighs towards a finding that the statute has a nonpunitive effect.

Second, the Court considers whether the sanction has historically been regarded as a punishment. Kennedy, 372 U.S. at 168-69. Civil commitments have been historically held as being nonpunitive. See Hendricks, 521 U.S. at 357 (noting that

1    authorized civil commitment have been traced to 18th century). This factor weighs

2    towards a finding that the statute has a nonpunitive effect.

3        Third, the Court considers whether the statute comes into play only on a finding

4    of scienter. Kennedy, 372 U.S. at 168-69. Section 6600 et seq applies after one has been

5    adjudicated to be a sexually violent predator. A sexually violent predator includes those

6    found not guilty by reason of insanity. Cal. Welf. & Inst. Code § 6600(a)(2)(F).

7    Therefore, the statute does not apply only on a finding of scienter. This factor weighs

8    towards a finding that the statute has a nonpunitive effect.

9        Fourth, the Court considers whether the sanction's operation will promote the

10   traditional aims of punishment, namely deterrence and retribution. Kennedy, 372 U.S.

11   at 168-69. It can be conceived that an indeterminate commitment may serve as a

12   deterrent to commission of a sexually violent offence. However, "[a]ny number of

13   governmental programs might deter crime without imposing punishment. To hold that

14   the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would

15   severely undermine the Government's ability to engage in effective regulation." Smith,

16   538 U.S. at 102. (internal quotations omitted). Further, people committed under Section

17   6600 et seq are, by definition, suffering from a mental disorder that prevents them from

18   controlling their behavior. Therefore, they are not likely to be deterred by the threat of a

19   civil commitment. See Hendricks, 521 U.S. at 362-63. Additionally, the California

20   legislature repeatedly states that the statute's purpose is to treat those with a mental

21   disorder and to protect the public, suggesting the statute is not for retributive purposes.

22   See 1995 Cal. Legis. Serv. Ch. 763 (A.B. 888) (WEST); see also Hatton, 356 F.3d at

23   965 (finding a sex-offender registration statute was not retributive in part because of the

24   stated intent of the California legislature). Nothing suggests Section 6600 et seq was

25   intended to promote the traditional aims of punishment. This factor weighs towards a

26   finding that the statute has a nonpunitive effect.

27

28

1    Fifth, the Court considers if the behavior of the sanction is already criminalized.

2    Kennedy, 372 U.S. at 168-69. Section 6600 et seq generally applies to behavior that is

3    already criminalized under California law. However, Section 6600 et seq is also

4    triggered by those found not guilty by reason of insanity. Therefore, Section 6600 et seq

5    does not apply only to those who have been convicted of a crime. See Hatton, 356 F.3d

6    at 965-66 (finding the fifth prong of the Kennedy test to be nonpunitive where a sex-

7    offender registry law applied to those not convicted of a crime). Further, previous

8    conduct is used solely for evidentiary purposes to demonstrate that someone is a sexually

9    violent predator. See Cal. Welf. & Inst. Code § 6600(a)(3); Hendricks, 521 U.S. at 361-

10    62 (finding a civil commitment statute not to be retributive because prior acts were used

11    for evidentiary purposes only). "An absence of the necessary criminal responsibility

12    suggests that the State is not seeking retribution for a past misdeed. Thus, the fact that

13    the Act may be tied to criminal activity is insufficient to render the statut[e] punitive."

14    Id. This factor weighs towards a finding that the statute has a nonpunitive effect.

15    Sixth, the Court analyzes whether the challenged statute has a rational connection

16    to a nonpunitive purpose. Kennedy, 372 U.S. at 168-69; see also Smith, 538 U.S. at 102

17    (stating this is "a most significant factor" in the Kennedy test). The stated nonpunitive

18    purpose is public safety. See 1995 Cal. Legis. Serv. Ch. 763 (A.B. 888) (WEST). Civilly

19    committing individuals with a mental disorder making them particularly dangerous is

20    rationally related to the nonpunitive purpose of public safety. See Hendricks, 521 U.S.

21    at 361-62 (finding that an indefinite civil commitment is linked to the stated purpose "to

22    hold the person until his mental abnormality no longer causes him to be a threat to

23    others"). This factor weighs towards a finding that the statute has a nonpunitive effect.

24    Seventh, the Court analyzes whether the sanction appears excessive. "'A statute

25    is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive

26    aims it seeks to advance.' Instead, the question is 'whether the regulatory means chosen

27    are reasonable in light of the nonpunitive objective.'" Hatton, 356 F.3d at 965 (quoting

28

Smith, 538 U.S. at 103, 105). Here, commitment lasts only as long as the civil committee has a mental disorder and no longer. See Cal. Welf. & Inst. Code §§ 6604.9(d) (authorizing petition for release by the hospital if the civil committee no longer meets the sexually violent predator definition); 6607 (authorizing treatment outside of confinement if the hospital believes the civil committee is no longer a threat to society); 6608 (authorizing the civil committee to petition for release if the person believes they no longer meet the definition for a sexually violent predator). A civil commitment statute designed to detain an individual only until they are no longer a threat to public safety is not excessive. Hendricks, 521 U.S. at 363-64. This factor weighs towards a finding that the statute has a nonpunitive effect.

The balance of the factors strongly weigh in favor of finding that the Section 6600 et seq is non-punitive. In rejecting Petitioner's ex post facto and double jeopardy claims, the court of appeal ruling was not contrary to Supreme Court precedent. Further, the court of appeal could have reasonably found that Petitioner's civil commitment was not punitive in nature by utilizing the Kennedy seven-factor test and thus outside the scope of the Ex Post Facto and Double Jeopardy Clauses. Accordingly, Petitioner's argument fails on this point.

### iii.  Petitioner's Indeterminate Civil Commitment Does Not Violate The Eighth Amendment Ban on Cruel and Unusual Punishment

Finally, Petitioner argues that his indeterminate commitment violates the Eighth Amendment ban on cruel and unusual punishment. The Supreme Court has repeatedly held that the Eighth Amendment ban on cruel and unusual punishment protects those convicted of crimes from being punished inhumanely. See Whitley v. Albers, 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (stating "[t]he Cruel and Unusual Punishments Clause 'was designed to protect those *convicted of crimes…*'" (quoting Ingraham v. Wright, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977))) (emphasis added); Rhodes v. Chapman, 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d

33

59 (1981) (stating, "[t]he Eighth Amendment, in only three words, imposes the constitutional limitation upon *punishments*: they cannot be cruel and unusual.) (emphasis added); Estelle v. Gamble, 429 U.S. 97, 102–103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that the Eighth Amendment protects those *convicted of crimes* from being physically *punished* by barbarous methods, the unnecessary and wanton infliction of pain and ensures the penal measures represent concepts of dignity, civilized standards, humanity, and decency.) (emphasis added).

In rejecting Petitioner's argument that his indeterminate commitment violates the Eighth Amendment ban on cruel and unusual punishment, the holding of the court of appeal was not contrary to Supreme Court precedent. Further, the court could have reasonably held that Petitioner's civil commitment was not punitive in nature and therefore it did not fall within the Eighth Amendment ban. Petitioner simply states that his commitment is punitive in nature without citing to any case authority to support this contention. (Doc. No. 8 at 51.) Petitioner is therefore not entitled to relief on this claim.

## VI.

## RECOMMENDATION

For the aforementioned reasons, the Court **RECOMMENDS** Petitioner's Petition for Writ of Habeas Corpus be **DENIED** without prejudice. This Report and Recommendation is submitted to U.S. District Judge  William Q. Hayes, pursuant to the provision of 28 U.S.C. Section 636(b)(1).

**IT IS ORDERED** that no later than **March 25, 2016** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 8, 2016**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14-CV-1251

**IT IS SO ORDERED.**

Dated:  February 23, 2016

_____

Hon. William V. Gallo
United States Magistrate Judge

14-CV-1251